The IAM STOCK OWNERSHIP INVEST-
MENT TRUST FUND and Russell
McGarry, as Plan Trustee of the IAM
Stock Ownership Investment Trust
Fund, Plaintiffs,

v.

EASTERN AIR LINES, INC.,
Defendant.

Civ. A. No. 86–208–JLL.

United States District Court,
D. Delaware.

July 3, 1986.

Henry N. Herndon, Jr. and Grover C. Brown of Morris, James, Hitchens & Williams, Wilmington, Del. and Stephen L. Hester, Robert D. Rosenbaum, Philip W. Horton, David P. Gersch of Arnold & Porter, Washington, D.C., of counsel, for plaintiffs.

Paul P. Welsh and Palmer L. Whisenant of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. and James H. Bratton, Jr., John G. Despriet, and Edward H. Wasmuth of Smith, Gambrell & Russell, Atlanta, Ga., of counsel, for defendant.

LATCHUM, Senior District Judge.

The plaintiffs in this case, The IAM Stock Ownership Investment Trust Fund (the "Trust") and Russell McGarry, the Plan Trustee of the Trust ("Trustee McGarry"), have moved for the entry of a mandatory preliminary injunction directing the defendant, Eastern Airlines, Inc. ("Eastern"), to pay and/or irrevocably commit to pay substantial legal and investment banker fees on the ground that Eastern is obligated under relevant governing instruments and under the Employee Retirement Income Security Act of 1974 ("ERISA") to pay such fees.[1] At the conclusion of oral argument on the plaintiffs' motion, the Court denied the preliminary injunction and reserved the right to issue a later opinion which would elaborate on the reasons for its oral ruling. This is that opinion.

## FACTUAL BACKGROUND

The event which immediately precipitated the present controversy was Eastern's signing of a Merger Agreement dated February 24, 1986 with Texas Air Corporation ("Texas Air"). The plaintiffs argue that McGarry, as a fiduciary, is required to obtain "qualified independent financial advice" to assist him in making the decision whether to demand appraisal of the Eastern securities held by the Trust. Without such advice, the Trustee purportedly cannot make informed decisions for the benefit and protection of the Trust's 12,658 participants and beneficiaries. (D.I. 1, ¶ 1.) Although faced only with a motion for a preliminary injunction, the Court nevertheless must briefly sketch the various factors which motivate the parties involved in this dispute. The dispute is not merely one involving the interpretation of a contract. As with many a motion for a preliminary injunction, much substance and strategy lie beneath the surface of the complaint.

As a result of financial difficulties, Eastern was compelled to enter into negotiations with its various labor unions. The company's employees, represented by District Lodge 100 of the International Association of Machinists and Aerospace Workers (the "IAM"), agreed to accept substantial wage reductions, totaling approximately $263,000,000 in 1984, in exchange for 12,000,000 newly issued shares of Eastern common stock representing a total of 25% of Eastern's total outstanding common stock, and 3,000,000 shares of a newly created security, 20% Preferred Stock. Under this 1984 Wage Investment Program ("WIP Program") both the common and preferred stock were contributed to several trust funds. (D.I. 1, ¶ 7.) In addition to the Trust, Eastern and the IAM created two stock plans, "The IAM Eastern Air Lines Common Stock Plan" (the "Common Stock Plan"), and "The IAM Eastern Air Lines Preferred Stock Ownership Plan" (the "Preferred Stock Plan").[2] Currently, the Trust holds approximately 3,464,000 shares of common stock, 5.8% of Eastern's outstanding common stock prior to the Texas Air transactions, and 879,000 shares of 20% Preferred Stock, or approximately 30% of the outstanding shares of that series. (*Id.* at ¶¶ 8–9.)[3]

1. The Court has jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 and venue under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391.

2. The Trust Plan and Common and Preferred Stock Plans can be found in the Complaint, D.I.

1 at Exhibits B and C, respectively. Pertinent provisions will be cited only by name of the Plan and section number.

3. The 20% Preferred Stock carries an aggregate dividend of 20% of Eastern's net income in any year, and the 20% Preferred Stock is convertible

On February 24, 1986, Eastern and Texas Air, a holding company which controls Continental Air Lines and New York Air, entered into a Merger Agreement under which Eastern is to be merged into a wholly-owned subsidiary of Texas Air and continue as a surviving corporation following the merger. (D.I. 1, ¶ 11.) Trustee McGarry points with concern to Section 1.7 of the Merger Agreement. That section provides for the conversion of Eastern's outstanding shares of common stock into cash and subordinated debentures. At the time of the merger, all the common stock of the Eastern subsidiary will automatically convert into an equal number of shares of the surviving corporation. Texas Air will become the owner of all of Eastern's common stock. However, all of Eastern's preferred stock, including the 20% Preferred Stock held by the Trust, will remain outstanding. Although the 20% Preferred Stock will continue to be convertible into Eastern's common stock, the common stock will no longer be publicly traded and listed on the New York Stock Exchange. This stock will then represent a minority interest in a privately held subsidiary of Texas Air. (*Id.* at ¶ 12.) The plaintiffs state in their complaint that this 20% Preferred Stock will become an illiquid investment unless prior to the merger the Trustee converts this stock into common shares so as to receive the cash and subordinated debentures. The merger consideration of $10 or less may be inadequate in view of the liquidation preference of the preferred shares of $86.67 per share. (*Id.* at ¶ 13.)

Furthermore, the Merger Agreement includes a "lock-up agreement" under which Eastern sold Texas Air 10,935,000 shares of Eastern common stock at $6.25 per share, payable 50% by note, and granted Texas Air an option to purchase an additional 10,000,000 shares at a price equal to $7.50 per share. Eastern also paid a "bonus" of $20,000,000 to Texas Air for entering into the Merger Agreement. (D.I. 1, ¶ 14.)

Eastern granted the participants of the Trust preemptive rights to purchase additional "top-up" shares so that they could maintain their proportionate equity ownership interests. The parties dispute whether the sale of stock to Texas Air pursuant to the "lock-up" provisions triggered the right of the participants to purchase these shares. The Trustee also seeks legal and investment advice on this issue. (D.I. 1, ¶ 20(f).)

The plaintiffs also charge that the merger was approved by Eastern's board of directors in a hasty weekend meeting without obtaining all the necessary information for an informed decision. Salomon Brothers, the investment banking firm, retained by Eastern's outside directors to issue a fairness opinion on the price offered for the common stock in the merger, declined to issue the opinion on the ground that it did not have sufficient time to evaluate the transaction. Trustee McGarry also points to press reports on the Merger Agreement that describe the price paid by Texas Air as a "bargain" and to statements by industry observers that they considered the price to represent a "steal." (D.I. 1, ¶ 15.) The plaintiffs underscore the urgency of their motion for a preliminary injunction in view of Eastern's plans for a stockholder's meeting in the near future to approve the merger.

On March 24, 1986, counsel for the Trust and Trustee McGarry notified Eastern that McGarry needed expert independent financial advice in evaluating the impact of the proposed merger consistent with his duties under ERISA and stated that the potential financial advisers of the Plan Trustee required assurances that Eastern would promptly pay their fees when retained. (D.I. 1, ¶ 22.) Eastern responded by letter

into common stock on a one-to-one basis. When dividends on the 20% Preferred Stock total $260,000,000, that stock automatically will convert into an equal number of shares of common stock. Upon any liquidation of Eastern, the liquidation preference of the preferred stock totals $260,000,000 or $86.67 per share. Eastern describes its preferred stock as an "interest free loan" of the wages which the participating employees contributed to the company in the WIP Program. (D.I. 1, ¶ 10.)

dated April 3, 1986, refusing to provide any assurances of prompt payment and stating its belief that the Trust acted improperly. (*Id.* at ¶ 23.) On April 28, 1986, the Trust again wrote Eastern, repeating its need for a financial adviser and asked Eastern to advise the Trust "as soon as possible" if Eastern desired to discuss the issue. (*Id.* at ¶ 25.) By an Engagement Letter dated April 30, 1986, the Trust agreed to retain the firm of Donaldson, Lufkin & Jenrette Corp. ("DLJ") to render independent financial advice to the Trust on the merger. (*Id.* at ¶ 26.)[4] On April 30, 1986, the Trust sent a copy of the Engagement Letter to Eastern and requested Eastern to execute an appropriate letter committing itself to payment to DLJ as required by the Engagement Letter and return the executed letter and the $50,000 engagement fee on or before May 7, 1986. (*Id.* at ¶ 27.) Eastern sent a letter dated May 6, 1986 to the Trust stating that it would not "reimburse the Trust for funds expended by the Trust in connection with the activities described in the Engagement Letter." (*Id.* at ¶ 29.)

## I. ANALYSIS

■ A party moving for a preliminary injunction must demonstrate that that party will be irreparably injured *pendente lite* if relief is not granted and that there is high probability of eventual success on the merits in the litigation. *Spartacus, Inc. v. Borough of McKees Rocks,* 694 F.2d 947, 949 (3d Cir.1982) (quoting *Eli Lilly & Company v. Premo Pharmaceutical Laboratories,* 630 F.2d 120, 136 (3d Cir.1980), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980)). An injunction is an extraordinary remedy. The burden is on the movant to show a clear right to such relief. *Avins v. Widener College, Inc.,* 421 F.Supp. 858, 860 (D.Del.1976). In addition to the requirements listed above, the mov-

ant must show that he will suffer greater injury if relief is denied than the other party will suffer if relief is granted and that neither other interested parties nor the public interest will be substantially harmed if relief is granted. *Id.* In addition, a mandatory preliminary injunction, which Trustee McGarry seeks, is to be "sparingly exercised," *United States v. Spectro Foods Corp.,* 544 F.2d 1175, 1181 (3d Cir.1976), and the burden on the moving party is "particularly heavy." *Punnett v. Carter,* 621 F.2d 578, 582 (3d Cir.1980).

### A. Irreparable Injury and Lack of Adequate Legal Remedy

#### 1. Assets available for proper Trust purposes.

■ Trustee McGarry argues that irreparable injury will result if he is forced to consider Eastern's Merger Agreement with Texas Air without the benefit of independent legal and financial advice and thus be unable to make investment decisions in a manner which would maximize the value of the Trust's Eastern securities. (D.I. 5 at 25.) Basically, the decision involved is to determine whether to demand appraisal of the securities or to accept a consideration offered in the Merger Agreement. (*Id.* at 25–26.) The need for advice on this matter is urgent. The Trustee must make the decision concerning the merger in time for the Eastern stockholders' meeting which will act on the proposed merger. This meeting could occur as early as July 1986. (*Id.* at 27.)

The Trustee contends that he will be unable to obtain independent advice because no part of the Trust's assets may be used for any of the expenses of the Trust. (D.I. 5 at 23–24.)

---

**4.** The Engagement Letter provided for payment to DLJ of: (a) an engagement fee of $50,000; (b) an advisory fee of $25,000 per calendar quarter commencing with the third quarter of DLJ's engagement; (c) a completion fee of $500,000 less all fees previously paid; and (d) DLJ's reasonable out-of-pocket expenses. The Engagement Letter provided that it would be-

come effective only when Eastern tendered the $50,000 engagement fee to DLJ, paid all further amounts the Trust was obligated to pay under the Engagement Letter, provided DLJ with reasonable access to relevant Eastern documents and personnel, and used its best efforts to provide DLJ with access to Texas Air documents and personnel. (D.I. 1, ¶ 26.)

First, under §§ 4.3 and 4.4 of the Common Stock Plan and § 4.3 of the Preferred Stock Plan, all assets of the Trust have already been allocated to the participants' accounts and thus are unavailable for the expenses at issue. Second, this payment would be an "impermissible cut-back" of an accrued benefit under ERISA, 29 U.S.C. § 1054(g)(1), which commands that "The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) of this title." (D.I. 5 at 23–24.) Third, § 7 of both plans provides that "A participant's interest in his [account] shall be fully vested and nonforfeitable for any reason." Use of the assets for trust expenses would diminish the participant's nonforfeitable accounts and would therefore be an impermissible cutback in accrued benefits. (*Id.* at 24.) Finally, this use of assets would also constitute a loan to Eastern and would therefore be a "prohibited transaction" under 29 U.S.C. § 1106(a)(1)(B) of the ERISA statute. That section prohibits the "lending of money or other extension of credit between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(D) also prohibits the "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

The Court agrees with the defendant's contrary construction of the Trust Agreement and the two stock plans. These contracts clearly allow the Trustee to withdraw funds for the expenses contemplated by the Trustee. First, the Plan Trustee can authorize and direct the Asset Trustee to borrow money or to issue notes as collateral for certain loans. Any property of the "Trust Fund" can be pledged for this purpose. The terms of the Trust Agreement directly contradict the plaintiffs' argument that since all the trust assets are allocated to the individual participants, such property cannot be disturbed. Section 2.2–9 of the Trust Agreement clearly grants power to give a valid security interest in the shares.[5] Furthermore, "Trust Fund" is defined in Section 1.3 of the Trust Agreement. That section defines contributions in accordance with the terms of the plans as part of the Trust Fund: "All such property and contributions, together with income thereon and increments thereto, shall constitute the 'Trust Fund' to be held in accordance with the terms of this Trust Agreement." There are thus no exceptions for allocations to individual participants. In Section 11.7 of the Common Stock Plan and Section 10.7 of the Preferred Stock Plan the Plan Trustee is empowered to vote all shares including those individually allocated. Simply put, the shares are part of the Trust Fund and could thus serve as collateral for a loan.[6]

■ Moreover, Section 1.6 of the Trust Agreement recognizes a right "for defraying reasonable expenses of the operation and administration of the Plans and the Trust, prior to the satisfaction of all liabilities under the Plans." Thus, Section 1.6

---

**5.** Section 2.2–9 of the Trust Agreement reads as follows:

[The Asset Trustee has power] to the extent authorized and directed by the Plan Trustee, to borrow money upon such terms and conditions and at such reasonable rates of interest as the Asset Trustee may deem to be advisable; to issue its promissory note as Asset Trustee to evidence such debt; and to secure the payment of such note by pledging any property of the Trust Fund.

**6.** At oral argument and in their Reply Brief, the plaintiffs stated that counsel had contacted a number of banks and concluded it would be "doubtful" that any bank would make a loan to the Trust because of counsel's inability to opine that a valid security interest could be given in the shares allocated to the individual accounts.

The fallaciousness of this assumption is patently obvious. The Court is also doubtful that the pledged shares, on consummation of the merger, "would cease to be marketable" and therefore banks would have only a "right in the Trust's ultimate recovery in an appraisal proceeding." (D.I. 26 at n. 30.) The plaintiffs simply have not carried their heavy burden on this point, especially in light of the automatic conversion of Eastern common shares into cash and subordinated debentures on consummation of the merger, eminently appropriate collateral for the loan contemplated here. (D.I. 1, ¶ 12.) Only the 20% Preferred Shares would raise such fears among the Trust's bankers. The Trust Fund possesses 12,000,000 shares of common stock as opposed to 3,000,000 shares of 20% Preferred Stock. (*Id.* at ¶ 7.)

merely incorporates a right recognized by the common law of trusts, as reflected in the Restatement (Second) of Trusts: "The trustee can properly incur expenses which are necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust, and such other expenses as are authorized by the terms of the trust." Restatement (Second) of Trusts § 188 (1959).

■ Trustee McGarry's interpretation of the Internal Revenue Code and the ERISA statute also fails for matters of logic. The Trustee theorizes that it would be inconsistent with 26 U.S.C. § 411(d)(6) of the Internal Revenue Code to permit the use of Trust assets to pay the Trust expenses he is contemplating. That section only provides that a plan will not qualify for tax exempt status "if the accrued benefit of a participant is decreased by an amendment of the plan ...." "Accrued benefit" in Section 411(a)(7)(A)(ii) of that title is defined in general as the "balance of the employee's account." The Trustee's stringent interpretation of the statute is clearly wrong. Ordinary and appropriate trust expenses, although they decrease the account of a participant, leaving a "balance" in accordance with Section 411(a)(7)(A)(ii), do not decrease the "accrued benefit" of that participant.

■ The Trustee's interpretation of the ERISA statute is also wrong for similar reasons. Applying trust assets to trust expenses is not "an impermissible cutback in an accrued benefit" under ERISA, 29 U.S.C. § 1054(g)(1). ERISA defines "accrued benefit" in the same language as the definition in 26 U.S.C. § 411(a)(7)(A)(ii). 29 U.S.C. § 1002(23)(B). As part of a plan fiduciary's standard of duty, ERISA provides for "defraying the reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(ii). The Trustee's argument is also without merit that any amendment to the Plan would be required

in this case and therefore the only kind of "cutbacks" prohibited by 29 U.S.C. § 1054(g)(1) are those caused by plan amendments. That section provides that "the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan ...." 29 U.S.C. § 1054(g)(1). This section is irrelevant to the plaintiffs' position. Amendments to the Plan are not at issue.

In addition, the ERISA statute states explicitly that a plan's assets shall be held "for the exclusive purposes of providing benefits to the participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). The plaintiffs have established no legitimate reason why "reasonable expenses" would not include expenses for independent financial and legal advice—provided, of course, that these expenses are solely for the benefit of the Trust and its participants. In enacting ERISA, Congress invoked the common law of trusts to define the trustee's general duties and responsibilities. Under the common law of trusts, trustees have "such powers as are necessary or appropriate for the carrying out of the purposes of the trust." *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.,* —— U.S. ——, 105 S.Ct. 2833, 2840, 86 L.Ed.2d 447 (1985) (quoting 3 A. Scott, Law of Trusts § 186 (3d ed. 1967)).

■ The Trustee also argues that because a participant's interest is fully vested in nonforfeitable assets according to Section 7 of the two stock plans, trust expenses cannot be charged against the fund.[7] Whether expenses may be charged against the trust's assets has nothing to do with the concepts of forfeiture in vesting. *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 512, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981). Although nonforfeitability as defined in the statute guarantees

---

**7.** Section 7 of the Common Stock Plan reads: "A Participant's interest in his accounts under this Plan shall be fully vested and nonforfeitable for any reason." Section 7 of the Preferred Stock

Plan reads: "A Participant's interest in his Stock Account under this Plan shall be fully vested and nonforfeitable for any reason."

the legal enforceability of an employee's claim to a protected benefit, it does not guarantee a particular amount. "[I]t is the claim to the benefit, rather than the benefit itself, that must be 'unconditional' and 'legally enforceable against the plan.'" *Id.* Similarly, expenses charged against the plan do not violate the rule of vesting. "A reduction in accrued benefits, standing alone, does not affect the right to obtain benefits and thus does not affect vesting. It changes only the amount of benefits a pensioner receives, *not* his vested status." *Stewart v. National Shopmen Pension Fund,* 730 F.2d 1552, 1562 (D.C.Cir.), *cert. denied,* 469 U.S. 834, 105 S.Ct. 127, 83 L.Ed.2d 68 (1984).

■ Finally, the Trustee's argument that the use of assets for the expenses at issue would constitute an impermissible loan to Eastern under 29 U.S.C. § 1106 *et. seq.* is unavailing. It stretches the imagination and the meaning of the English language to term Eastern's contested obligation to the Trustee under the governing instruments a "loan."

**2. Action for a breach of contract: Adequate remedy at law.**

■ Consequently, the basic thrust of the Trustee's action is a claim of a breach of contract. The Trustee argues that the plaintiffs will suffer irreparable damage because the terms of the Trust Agreement and certain ERISA provisions would prevent him from obtaining the necessary funds for financial and legal advice. However, since this argument is without avail because he can obtain such funds, his dramatic action in bringing a motion for a preliminary injunction is simply dressing for a mundane breach of contract claim. The Trustee is thus asking the Court for the extraordinary remedy of an injunction to enforce payment of monies, clearly not a remedy appropriate for equity. An award of monetary damages in a subsequent suit on the merits would fully compensate the plaintiffs in this case. *Avins v. Widener College, Inc.,* 421 F.Supp. 858, 861 (D.Del. 1976).

**B. Probability of Success on the Merits**

**1. Expenses sought by Trustee appear to serve IAM and its objectives.**

■ To support their argument that they enjoy a high probability of success on the merits, the plaintiffs state that Trustee McGarry is clearly authorized in his fiduciary capacity to incur reasonable expenses for financial and legal advice. Section 2.4–1 of the Trust Agreement empowers the Trustee to vote Eastern common stock held in the Trust and to consider and vote on any plans to merge, refinance, or reorganize Eastern. Sections 2.4–2 and 2.2–8 authorize and direct the Trustee to either exercise or refrain from exercising any options with respect to shares of stock held by the Trust. To implement such decisions, Section 2.4–4 and 2.4–5 authorize the Trustee to employ financial and legal advice. (D.I. 5 at 12–13.) Section 3.3 of the Trust Agreement provides that "all reasonable expenses of administering this Trust and the Plans, including, but not limited to administrative, legal, investment and brokerage services expenses ... incurred by ... the Plan Trustee ... shall be paid by the Company."

The propositions which the Trustee draws from these citations are correct. There is no serious dispute that it is within his fiduciary duties to seek legal and financial assistance in exercising his discretion. Moreover, the plaintiffs are correct in arguing that Trustee McGarry is obligated both under the ERISA statute and under the common law of trusts as a fiduciary to obtain qualified independent assistance to satisfy his duty to act solely in the interest of the participants and beneficiaries of the Trust. (D.I. 5 at 14–22.) The Court does not dispute the complexity of the decision facing the Plan Trustee whether to seek appraisal of the Trust's common stock and 20% Preferred Stock or acceptance of consideration offered for the common stock in the Merger Agreement. This complexity is further compounded by the doubts raised in the press and other reports as to the

fairness of the consideration in the Merger Agreement.

However, the central issue on this prong of the test for granting a preliminary injunction is whether at a trial on the merits there is a high probability that a court would find that Eastern would be liable for the expenses sought by the Plan Trustee.

Trustee McGarry is restricted by several limitations in the various agreements between the IAM and Eastern which determine what expenses he can rightly compel Eastern to pay. Section 3.3 of the Trust Agreement provides that "all reasonable expenses of administering this Trust and the Plans ... shall be paid by the Company."[8] Such expenses are "subject to the limitations set forth in Section 11.11 of the Common Stock Plan and Section 10.11 of the Preferred Stock Plan." Those sections require the Trustee to give a certification that expenses Eastern has to pay are "directly and entirely related to the proper operation and administration of the Plan or Trust Fund and were not related to the affairs of the IAM, the representation by the IAM of the Company's employees, IAM internal matters or any other activities relating to maintaining, assisting or contributing to the IAM ...." (Common Stock Plan, § 11.11–4; Preferred Stock Plan, § 10.11–4.) In addition, this certification is meant to ensure that Eastern "shall not be obligated to pay or reimburse any expenses, claims, obligations or liabilities to the extent that such payment, reimbursement or indemnification would be, or could

reasonably be construed to be, in violation of the Railroad Labor Act, ERISA, the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, or any applicable state securities laws." Section 2 of the Railroad Labor Act, 45 U.S.C. § 152, Fourth, forbids a carrier "to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining or in performing any work therefor."[9] Thus far, the plaintiffs have not presented the evidence demonstrating that Eastern has received the required certificate.[10]

On the contrary, the evidence is far from clear that such certification could have an honest basis in fact. Eastern has presented considerable documentary and testimonial proof to the Court first, of strong opposition by the IAM for union purposes against the consummation of the merger proposed between Eastern and Texas Air, and second, of Trustee McGarry's conflict of interest resulting from his close association with the IAM and its leadership. John F. Peterpaul, IAM's general Vice President of Transportation at the international level, testified that it had always been a goal of his to have an employee-owned carrier. (D.I. 23A at 68–69.) IAM's opposition to Texas Air's acquisition of Eastern is understandable in light of the long and bitter strike by the IAM against Continental, Texas Air's principal subsidiary. The strike failed and collapsed in futility in 1985.

---

**8.** Section 3.3 of the Trust Agreement reads:

**Expenses.** Subject to the limitations set forth in section 11.11 of the Common Stock Plan and section 10.11 of the Preferred Stock Plan, all reasonable expenses of administering this Trust and the Plans, including, but not limited to administrative, legal, investment and brokerage services expenses, whether incurred by the Asset Trustee, the Plan Trustee or the Committee, shall be paid by the Company.

**9.** 45 U.S.C. § 152, Fourth, provides in pertinent part:

No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any

way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization....

**10.** Although the plaintiffs contend that they have provided the certification to Eastern, citing Plaintiffs' Ex. 28 of the Plaintiffs' Deposition, Mr. Rosenbaum, the attorney for the plaintiffs deposing Richard P. Magurno, Senior Vice President of Eastern, never established that this exhibit actually represented the required certification. (D.I. 22D at 147–48.)

Frank Lorenzo, the president of Texas Air, is perceived by airline labor as having a very high disregard for organized labor. (D.I. 22C at 199.) Charles E. Bryan, President of IAM District Lodge 100 and a combative opponent of Eastern and its management, voted against the Texas Air-Eastern transaction as an Eastern director. IAM has also moved to oppose it. (*Id.* at 171–72.)

Although the plaintiffs have attempted to establish McGarry's independence from Bryan, the main negotiator for the IAM in disputes with Eastern (D.I. 26 at 8–24), they have not rebutted the solid inferences of a close relationship existing between McGarry and the IAM. Trustee McGarry is a salaried IAM official and currently serves as Vice President and General Chairman of the IAM District Lodge 100. (D.I. 22A at 4.) He reports to Bryan. McGarry serves on the IAM District Lodge 100's negotiating committee and in that capacity participated in IAM's 1983–84 negotiations with Eastern about the 1984 WIP and Trust Agreement. (D.I. 22A at 28; D.I. 22B at 18.) The plaintiffs' reputed efforts to segregate McGarry from IAM consideration of the merger appear contrived after the fact.[11]

Furthermore, the nature of the anticipated expenditures by the Trustee are open-ended in terms of their subject matter. Trustee McGarry presently is asking for over $80,000 in attorneys' fees for the work done by Arnold & Porter, the main counsel of the plaintiffs, in a commitment binding Eastern in a letter agreement with DLJ for investment banking services. Specifically, the DLJ Engagement Letter beyond requiring an initial engagement fee and a final $500,000 completion fee involves evaluating *any* financial proposals offered by *any* other person or groups which could increase DLJ's fee by $100,000 for each such offer evaluated up to a $200,000 limit. Eastern's exposure would also include broad indemnification including DLJ's out-of-pocket expenses such as "reasonable fees and expenses of its counsel." In its preliminary injunction motion, Trustee McGarry also asks the Court to prohibit Eastern "from requiring or attempting to require the Trust or the Plan Trustee to divulge any information in connection with any bills for legal representation or financial advice other than names of the persons employed, their billing rates, the amount of time they worked, and out-of-pocket expenses they incurred." (D.I. 1, Count II, ¶ 1(d).) Such a commitment would bind Eastern to the unilateral, unappealable determination of the expenses by the Plan Trustee, whose true loyalties are seriously in question.[12]

The Court finds that such broad discretion could potentially enable the Trustee to use Eastern as a source of funds, if even in an indirect fashion, for the IAM management's publicly announced goal of blocking the proposed merger between Texas Air and Eastern. It is highly likely that the expenses sought by the Trustee are prohibited by the parties' instruments as not "directly and entirely related to the proper operation and administration of the Plan or Trust Fund" but instead "related to the affairs of the IAM … [and] activities relat-

---

**11.** Eastern has moved this Court to remove Trustee McGarry as Plan Trustee of the IAM Stock Ownership Investment Trust Fund and to appoint in his stead a "disinterested and impartial" Plan Trustee. Eastern stated to the Court that negotiations were unsuccessful with opposing counsel for the plaintiffs on the issue of removal. (D.I. 27.)

The Court finds the argument for removal has facial merit, particularly where a trustee is in a dual capacity such as Trustee McGarry in which he has strong motivation to use the funds of the Trust for non-trust purposes involving blocking a merger. The Trustee's divided loyalties would probably proscribe his activities as violating the stringently high standard of care required of

plan trustees imposed by 29 U.S.C. § 1104(a)(1)(A) and (B).

The Court notes this authority at present only for the purpose of ruling on what are proper trust expenses. The issue of removal is a dispute for another day.

**12.** As further evidence of the singular motivation behind the suit by Trustee McGarry, no other Eastern IAM–related stockholder has filed suit against Eastern. Eastern makes the convincing argument that this is because the Trustee is the only IAM–related Eastern stockholder with the potential ability to attack Eastern's merger at Eastern's expense. (D.I. 20 at 39–40.)

ing to maintaining, assisting or contributing to the IAM ...." (Common Stock Plan, § 11.11–4; Preferred Stock Plan, § 10.11–4). The plaintiffs' offer of proof that Trustee McGarry is seeking only to maximize the Trust's asset value, consistent with his fiduciary duties under ERISA, is of little avail in the context of ERISA's mandate that a plan fiduciary shall discharge his duties *solely* in the interests of participants and beneficiaries and for the *exclusive* purpose of providing benefits to them. 29 U.S.C. § 1104(a)(1)(A) and (B).

It is more open to question, however, whether the funds provided to the Trust "could reasonably be construed to be" in violation of the Railroad Labor Act's prohibition against "assisting or contributing" to the IAM. 45 U.S.C. § 152, Fourth. That provision is aimed at efforts by the employer "to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization ...." *See International Association of Machinists v. Street,* 367 U.S. 740, 759, 81 S.Ct. 1784, 1795, 6 L.Ed.2d 1141 (1961); *American Airlines, Inc. v. National Mediation Board,* 588 F.2d 863, 865 (2d Cir.1978). Although the requested financing would undoubtedly affect the IAM and "influence" the union in some fashion, the monies would not be aimed at undermining the employees' right to organize and to elect labor representatives and ultimately aimed at formation of company-dominated unions, the illegal purpose which Congress sought to prevent in enacting the statute.

**2. Trustee McGarry's proposed expenses largely constitute the expenses of voting shares for which Eastern is not obligated under the Plans.**

 Eastern also points to a limitation in the Stock Plans of its obligation to pay the expenses requested by Trustee McGarry because they are the expenses of voting shares:

The Company shall not be required to indemnify the Plan Trustee or any other person with respect to any costs, damages, expenses or liabilities caused by or

arising in connection with (i) the voting or soliciting of proxies for voting by the Plan Trustee of any shares of Common Stock or Preferred Stock or the performance of any act or duty relating to any matter other than the operation and administration of the Plan and Trust, or (ii) gross negligence, misfeasance or violation of law or the terms of this Plan or the Trust.

(Common Stock Plan, § 11.11–3; Preferred Stock Plan, § 10.11–3.) In the plaintiffs' complaint (D.I. 1, ¶ 20(a)), the Trustee states he needs advice to help him "decide whether to vote the common stock held in the Trust in favor of the merger, or alternatively, to seek appraisal ...." Appraisal is a procedure, argues Eastern, which is available only to stockholders who have "not voted in favor of or consented to the merger." 8 *Del. C.* § 262(b)(1). The Trustee also seeks financial and legal advice on whether the impact of the merger on the preferred stock would entitle the preferred stockholders to a class vote on the merger and to bring any necessary legal proceedings to enforce such a right. (D.I. 1, ¶ 20(b).)

The plaintiffs offer three arguments in opposition to Eastern. First, the plaintiffs contend that the limitation in question refers only to indemnification for legal claims, not for voting expenses. The preamble to the relevant Stock Plans states that certain persons will be indemnified "against any and all costs, damages, expenses, and liabilities reasonably incurred" by them "in connection with any claim made against him or in which he may be involved ...." (Common Stock Plan, § 11.11; Preferred Stock Plan, § 10.11.) This indemnification is limited by the conditions following the preamble, which include the limitation cited by the defendant. Trustee McGarry contends that the indemnification for "costs, damages, expenses or liabilities" connected with voting or soliciting of proxies for voting, excluded by that section, refers only to costs and expenses incurred by an indemnitee "in connection with any claim made against him or in

which he may be involved." The Plan Trustee argues that the restriction cited by Eastern simply does not apply since the expenses at issue are unrelated to any claim against the Trustee. (D.I. 26 at 28–30.)

The plaintiffs' argument on this point is unconvincing. They disingenuously focus on only one aspect of the possible expenses that may be incurred by Trustee McGarry. The heading of the preamble is broad: *"Compensation, Reimbursement and Indemnification by Company."* In addition to expenses involving legal claims, the preamble also states that the Plan Trustee, among others, "shall in any event be fully reimbursed for all expenses incurred in connection with his duties . . . ." Thus, the "expenses" referred to in Section 11.11–3 of the Common Stock Plan and Section 10.11–3 of the Preferred Stock Plan assume an equally broad meaning. No language in those sections points to the contrary. Legal liability is only one of many possible expenses incurred by the Trustee.

The plaintiffs' manner of citation is faulty for another reason. They neglect to cite the remaining portion of the relevant section on voting or solicitation. Indemnification is excluded for expenses incurred by the Plan Trustee involving voting or soliciting of proxies for voting relating to "any matter *other than* the operation and administration of the Plan and Trust . . . ." (Common Stock Plan, § 11.11–3; Preferred Stock Plan, § 10.11–3.) (Emphasis added.) Thus, the defendant's extensive evidence suggesting activities by the Trustee beyond what Eastern must rightly pay for would also apply to this limitation.

■ The plaintiffs make a second argument that the limitation clause in question applies only to expenses arising from proxy solicitations, and not voting of shares, by the Trustee. Section 7.7 of the Trust Agreement expressly permits the Trustee to "solicit proxies from all shareholders of the Company with respect to all share-hold-er meetings and with respect to any and all matters which may be presented to the shareholders of the Company for a vote." The plaintiffs contend that Eastern was concerned that payment for expenses of such solicitation might violate the Railway Labor Act,[13] and that the limitation in the disputed sections of the Stock Plans is only a narrow exclusion of Eastern's obligation to cover "expenses caused by or arising in connection with any proxy solicitation undertaken by the Plan Trustee." (D.I. 26 at 31–33.)

The Court finds the Trustee's version of the relationship between the disputed sections and 7.7 of the Trust Agreement to be convincing as far as it goes. Again, however, their construction of the disputed sections is unduly narrow. Indemnification for both solicitation *and* straightout voting of shares is proscribed:

> The Company shall not be required to indemnify the Plan Trustee . . . in connection with (i) the voting *or soliciting of proxies for voting* by the Plan Trustee of any shares of Common Stock or Preferred Stock or the performance of any act or duty relating to any matter other than the operation or administration of the Plan and Trust . . . .

(Common Stock Plan, § 11.11–3; Preferred Stock Plan, § 10.11–3.) (Emphasis added.) The italicized language is a conjunctive phrase. Its exclusion would not affect the other part of subsection (i), which relates to "voting . . . by the Plan Trustee of any shares." Furthermore, the plaintiffs have said nothing concerning the generously inclusive wording of the phrase "or the performance of any act or duty" in the language cited immediately above. Eastern therefore would not have to reimburse the Trustee for any activities, including his retention of independent financial and legal advice concerning appraisal, approval of the merger, including voting of shares, beyond that properly relating to the operation of the Trust.

---

**13.** Eastern's Chairman of the Board, Frank Borman, provided Bryan with a letter dated August 17, 1984, explaining that it might not be permissible because of the Railway Labor Act for Eastern to reimburse such expenses. (D.I. 26 at 31–32; D.I. 22D at 56–63.)

Finally, the Trustee argues that because Eastern is the only source of funds to pay for the advice he requires to pay for the merger, the Trust Agreement cannot be interpreted so as to frustrate the Trustee's ability to carry out his fiduciary obligations. (D.I. 26 at 33–34.) The answer to this contention is obvious from the Court's previous analysis of the plaintiffs' claim of irreparable harm.

**3. Trustee's duty to keep costs to a minimum.**

■ Both stock plans provide that "all parties shall endeavor in good faith to keep the expenses and the operation and administration of the Plan to the minimum amount which is consistent with the appropriate operation and administration of the Plan." (Common Stock Plan § 11.6; Preferred Stock Plan § 10.6.)

The defendant offers the following argument that the fees requested from Eastern for investment and legal advice would violate these provisions. Although the Trust Agreement, Section 3.3, provides that Eastern is to pay all reasonable expenses in administering the Trust and Stock Plans, it appears that the individual participants of the Plan have individual rights and powers with respect to voting the stock. Trustee McGarry proposes to spend Eastern's money in deciding whether to advise the participants to convert their preferred shares to common stock prior to the merger. However, the participants have the exclusive power to convert the 20% Preferred Stock (Preferred Stock Plan, § 6.2.) Advice received from lawyers, accountants, or brokers concerning conversion of shares are costs of individual participants, not general trust expenses. In addition, the plaintiffs have not pointed to any provisions in the IAM Trust Agreement or Stock Plan documents which authorize the Trustee to give such advice. It is certainly within the power of the Trustee in holding expenses to the minimum to advise the participants of their voting power and that he will follow their directions in voting their shares. The Preferred Stock Plan explicitly provides that "notwithstanding the Plan Trustee's general authority to vote the preferred stock and common stock held by this Plan, each participant shall be entitled to direct the Plan Trustee as to [the manner in which the preferred stock and common stock credited to the participant's stock account is to be voted]." In effect, the defendant insists on the importance of the distinction between simply advising participants of the *existence* of their power to vote and advising participants to vote in a *certain manner*.

■ Nevertheless, the plaintiffs have the stronger case, at least on this narrow point, in demonstrating a high probability of success on the merits. The Trustee has an affirmative—indeed, a high fiduciary—duty to evaluate the various alternatives facing the individual participants and to advise them on which alternative would most likely maximize their assets.

■ Section 11.7 of the Common Stock Plan provides that "[t]he Plan Trustee may vote, in his sole discretion, all shares of Common and Preferred Stock held by the Plan ...." It would be highly impractical to require each individual shareholder to perform his own evaluation and instruct the Trustee to vote accordingly. Such an inefficient procedure would raise the cost of the evaluation of the alternatives substantially above the cost of an evaluation performed by professional advisors of the Trustee alone. The defendant would have difficulty in winning this part of its case on the merits.[14]

---

**14.** On this narrow issue of the Trustee's power to seek outside advice concerning only *how to vote shares* in the context of the governing instruments' mandate to "minimize expenses," the Court would probably rule on the merits in favor of the plaintiffs. However, as already stated, the broad issue of a trustee's fiduciary duty to incur "reasonable expenses" pursuant to 29 U.S.C. § 1104(a)(1)(A) and (B) is more open to doubt.

The Court would rule similarly in favor of the plaintiffs on the issue of advice to the Trustee whether he should exercise "the right to purchase 'top-up' shares and to require Eastern through legal proceedings if necessary" to offer such shares. (D.I. 1, ¶ 20(f).)

In addition, the plaintiffs correctly point out that the decision to convert the 20% Preferred Stock forms only part of a broader question involving how best to maximize the Trust's holdings. The Court's holding that the defendant would probably not have to reimburse Eastern for the expenses involved in this larger question because of their probable connection with IAM objectives does not necessarily imply that such expenses are on their face so extravagant such that the Trustee is not in good faith keeping general trust expenses to a minimum. These are two separate questions.

Nevertheless, the defendant has offered sufficient evidence of the general weakness of the plaintiffs' underlying cause of action. For the other reasons discussed above, the Court finds that the plaintiffs do not enjoy a high probability of success on the merits in an eventual trial of this case.

### C. Effect of Preliminary Injunction Upon Instant Parties, Interested Third Parties, or Public

The Court will only briefly address the last two prongs of the standards of proof for granting a preliminary injunction: that the plaintiffs will suffer greater injury than Eastern and that neither other interested parties nor the public interest will be substantially harmed if the relief is granted.

As already discussed, Trustee McGarry has recourse to the substantial assets of the Trust from which to pay the plaintiffs' law firm and investment counsel. The only injury to the plaintiffs is the delay inherent in litigation in which they would seek reimbursement from Eastern. Otherwise, monetary compensation and interest would fully compensate them.[15] Eastern, on the other hand, could suffer considerable harm from an injunction. The open-ended language of the Engagement Letter and the secrecy with which the Trustee seeks to envelop the purposes of the advice could force Eastern into the untenable position of paying for obstructionist tactics against a transaction which it itself seeks to achieve. The delicately wrought agreement of merger could unravel to the great detriment of the defendant.

Finally, concerning the last requirement for a preliminary injunction, the Court can discern no untoward direct effects on either interested third parties or the public.

The only fair and reasonable recourse to the plaintiffs is to proceed to trial to test the merits of their case.

---

**15.** Trustee McGarry argued at oral argument that the balance of equities is with the plaintiffs on the issue of injury, and that Eastern, not the Trustee, should be at risk due to the uncertainty in the Trustee's ability to pledge stock in individual accounts and the unlikelihood that banks would make a loan of the necessary funds. As it stands, however, the contract imposes this risk on the plaintiffs.