Richard P. BARTHELEMY; Edison L. Denney, Plaintiffs–Appellants,

v.

AIR LINES PILOTS ASSOCIATION; Association TWA Master Executive Council; Henry Duffy; Harry Hoglander; Does 1 through 50, inclusive et al., Defendants–Appellees.

No. 88–15180.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 27, 1989.

Decided March 6, 1990.

Richard Barthelemy, Pro. per., Napa, Cal., in pro. per.

Robert F. Gore, National Right to Work Legal Defense Foundation, Springfield, Va., for plaintiffs-appellants.

Eugene B. Granof, Air Line Pilots Ass'n, Washington, D.C., and Ken Markowitz, Fisher and Hurst, San Francisco, Cal., for defendants-appellees.

Before BROWNING, PREGERSON and THOMPSON, Circuit Judges.

PER CURIAM:

Plaintiffs appeal from summary judgment granted against them on the basis of orders entered by the district court March 31, 1987 and June 20, 1988. We affirm the judgment for the reasons stated by District Judge Robert F. Peckham in two orders quoted in full in Part I and for the additional reason set out in Part II.

## I.

### A.

*Judge Peckham's Order of
March 31, 1987*

### INTRODUCTION

In this suit, two TWA flight deck crewmembers are challenging an August 5, 1985 agreement ("Agreement") between the Airline Pilots Association ("ALPA") and financier Carl Icahn. In that agreement, ALPA agreed to certain reductions in pay and benefits in its collective bargaining agreement with TWA if Icahn was successful in his attempt to gain control of TWA. Plaintiffs seek injunctive, declaratory, and monetary relief under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* They raise three issues: (1) that ALPA violated its duty of fair representation in assenting to the August 5 Agreement with Icahn, because its leadership had improper personal motivations which prompted that assent; (2) that the Agreement is void as contrary to the RLA because Icahn did not control TWA when the Agreement was signed and was therefore not the pilots' employer, and for other procedural reasons; and (3) that the Agreement is void as contrary to the RLA because it required the Icahn Group, if successful in its TWA takeover bid, to pay the fees of ALPA's investment banker, Lazard Freres. (ALPA used Lazard to seek out potential buyers for TWA who were less hostile to pilots' interests than Frank Lorenzo, the Texas Air chairman who was TWA management's choice to take over the airline.) Plaintiffs also seek to compel production of various discovery materials.

TWA and Icahn have been joined as indispensable parties, since plaintiffs seek to void both the Agreement and the collective bargaining agreement ("CBA") pursuant to that Agreement, which TWA and ALPA entered into after Icahn took control of TWA.

For the reasons described below, we grant summary judgment for defendants on plaintiffs' claim of breach of the duty of fair representation and plaintiffs' claim that the August 5 Agreement is contrary to the RLA because Icahn did not control TWA when the Agreement was signed, and for other procedural defects. We further deny plaintiffs' request to compel answers to interrogatories. We request further information and briefing about the nature of Lazard's contract with ALPA and Icahn's agreement to pay ALPA's bill from Lazard.

### FACTS

Deregulation has intensified competition in the airline industry. In 1985 TWA had an operating loss of $62.4m, and like many other airlines, sought concessions from labor as well as other economies. This put ALPA, which represents 39,000 commercial airline pilots on more than 40 carriers, in a difficult position. (ALPA's president since 1982 has been Captain Henry Duffy, a Delta Air Lines pilot. He was re-elected in November 1986 to another four-year term.)

In the spring of 1985, just before the start of contract negotiations between TWA and ALPA, Icahn announced he had acquired a large interest in TWA and was seeking control of it. TWA management convinced the ALPA Master Executive Council for TWA ("TWA–MEC") that they should oppose Icahn as a corporate raider who would dismantle the airline. The TWA–MEC contains 18 local council representatives plus three officers elected by the MEC for two-year terms. From June 1982 to June 1986, Captain Harry Hoglander, an active TWA pilot, was chairman of the TWA–MEC. Hoglander attended congressional hearings about Icahn's bid in early June 1985, and reported to ALPA leadership that despite ALPA's fears about Icahn, TWA management had not made out a very convincing case for their own abilities and that Icahn seemed sincere in wanting to preserve the airline intact. In addition, ALPA was working with other relevant unions to put together a proposal for an employee leveraged buyout of TWA and had scheduled meetings with TWA senior management to discuss it. ALPA Memorandum of Points and Authorities ("ALPA memo") at 6–7.

On June 13, 1985, TWA management announced it had reached agreement with Texas Air Corporation, the parent of Continental Airlines and New York Air (and now People Express) allowing Texas Air to take over TWA. No advance notice was given to ALPA. Texas Air is controlled by Frank Lorenzo. He is a particular *bete noire* to ALPA:

> ALPA representatives, both pilots and staff, who had sought to engage in collective bargaining with Mr. Lorenzo when he bought Texas International Airlines and then when he took over Continental reported that he was hostile to the collective bargaining process, was not interested in establishing a relationship with ALPA based on any degree of mutual trust, and reneged on understandings which ALPA negotiators thought they had reached with him.

ALPA memo at 9. Lorenzo had established New York Air as a separate non-union subsidiary which pays its pilots considerably less than comparable ALPA carriers. He had also taken Continental Airlines into bankruptcy in September 1983, permitting him to abrogate its existing labor agreements, thereupon establishing a new wage scale which "was approximately half the previous wage. The existing medical and retirement plans were eliminated, and working conditions were drastically ... altered." *Id.* The ensuing bitter strike was ongoing when TWA announced its plan to sell to Lorenzo. As Hoglander put it in a letter to TWA pilots, "We were sold like chattel to the one person everyone knew we found unacceptable." 12 August 1985 letter, Exhibit 5 to Hoglander Aff. The TWA–MEC feared that Lorenzo would cut TWA pilots' compensation drastically and/or transfer TWA assets to Continental, New York Air or other carriers so he could furlough TWA pilots. Hoglander Aff. at ¶¶ 8, 11. "Accordingly, the [TWA] MEC, with expert assistance, sought an alternate buyer for TWA—a 'white knight' in current financial jargon—who, in exchange for employee concessions, would make certain guarantees regarding job security, wages, benefits, and other working conditions." ALPA memo at 3.

Hoglander and the TWA–MEC then tried to find an alternate buyer for TWA. The MEC met frequently (120 hours in the days following June 13, 1985) and hired Lazard to pursue offers by potential buyers to join with the pilots or all three unions involved to buy TWA. "None of the offers proved satisfactory, however, because the potential buyers demanded absolute security or collateral for themselves while asking for heavy commitments from the pilots over long periods of time." ALPA memo at 10. In any event, ALPA realized from the start that Icahn could end the game by selling to Lorenzo, so it started talking to him as soon as TWA announced its plan to sell to Lorenzo. Hoglander's first meeting with Icahn was on June 15. "Mr. Icahn indicated he was interested in owning TWA, but that employee concessions were necessary to make it a profitable enterprise." *Id.* at 10–11. Detailed discussions ensued between ALPA and Icahn which resulted in the August 5 Agreement.

Hoglander says that the TWA–MEC was pursuing other possible suitors for TWA during July while it negotiated with Icahn, but

> our search in this regard was limited by two critical factors: (1) there had to be a fair likelihood that the TWA pilots would have better wages and working conditions with such a purchaser than we would with Mr. Icahn; and (2) there had to be a strong likelihood that such a potential purchaser would actually succeed in taking control of TWA. Inasmuch as Mr. Icahn and his associates had already amassed a considerable block of stock of TWA stock [sic]—close to a majority interest by August 5th—and were being quite receptive to our efforts to arrive at a mutually acceptable agreement, I regarded him as by far the best prospect. Our investment bankers searched for potential purchasers who would meet our qualifications, but failed to find any. I thought time was of the essence here, and the MEC was in accord. The longer we waited to find a viable alternative to Texas Air and Mr. Lorenzo, the more remote our chances of

blocking the TWA/Texas Air deal would become.

Hoglander Aff. at ¶ 12. The plaintiffs claim that ALPA's blind hatred of Lorenzo meant that it did not really explore other alternatives or offer to others what it offered to Icahn.

On July 1, ALPA and Icahn reached an agreement, which was superseded by a more detailed one on August 5. The basic elements of the August 5 Agreement were as follows: (1) It committed Icahn to seek control of TWA; (2) After the Icahn group gained control, ALPA would enter into a collective bargaining agreement with the "New TWA," effective January 1, 1986, which would cut aggregate pay and benefits by 26% from their June 1985 level (4% of which would come from "soft dollars," i.e., non-pay benefits); (3) The pilots received various compensating benefits: an Employee Stock Ownership Plan ("ESOP") would be established with 20% of the company's stock, of which pilots would receive a proportionate share; pilots would receive a proportionate share of 20% of the company's profits; only ALPA carriers could buy TWA aircraft, and TWA pilots offered employment on those carriers would receive TWA pay and benefits until December 31, 1988; the Icahn Group would make at least $127m capital expenditures annually at TWA; and pilots would have an option to let wages and benefits "snap back" to their 1985 levels after December 31, 1988. ALPA memo at 11–12.

This Agreement was ratified by TWA pilots in August 1985 by a vote of 1,277 to 293 (82% yes) and was embodied in a new CBA entered into in January 1986 after Icahn had cemented his control of TWA. The membership ratified this new CBA.

Hoglander wrote his members after the vote as follows:

I will not put a better face on the Icahn Agreement than is there. You all have a copy of it and indeed you voted by an 82% affirmative vote to go for it. Who can be enthusiastic about taking a sizeable pay cut? However, as with all issues in life, our collective ratification of this agreement was done with the knowledge

of the alternative clearly in sight. I urge you to remember that without our present agreement, we would have been folded into the Texas Air Corporation and by this time next year the life and world of TWA that we knew would have ceased to exist.... I am asking you to retain the memory of what has passed recently because I know memories are short. We will soon hear many expressing buyer's remorse: we gave in too quickly; we gave too much; we should have fought Lorenzo instead; it's a lousy deal. To those I say, you now have the distinct luxury of a Monday-morning quarterback.

Hoglander Aff., Exhibit 11, at 2.

The plaintiffs in this case are involved with a new union which is trying to replace ALPA as the pilots' bargaining agent.

### DISCUSSION

Summary judgment is proper when there is no genuine issue of material fact or when, viewing the evidence in the light most favorable to the non-moving party, the movant is clearly entitled to prevail as a matter of law. *Bank of California, N.A. v. Opie,* 663 F.2d 977, 979 (9th Cir.1981). Once a summary judgment motion is made and properly supported, the adverse party may not rest on the mere allegations of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Steckl v. Motorola, Inc.,* 703 F.2d 392, 393 (9th Cir.1983) (citing *Ruffin v. County of Los Angeles,* 607 F.2d 1276, 1280 (9th Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980)).

### 1. Breach of the duty of fair representation

Plaintiffs claim that ALPA's leadership was improperly motivated in reaching the Agreement. They say that Hoglander, the TWA–MEC chairman, feared losing his job as a TWA captain if Lorenzo took over, which would mean he would also lose his job as TWA–MEC chairman, with its various perks (such as access to a condominium in New York and time off from flying duties to attend meetings). They base this

claim on informal conversations with other pilots and the text of a long interview which Hoglander gave the TWA–MEC newspaper "The Lancet" dated October/November 1985. Attachment to Defendants' Summary Judgment Exhibit 8B. Most of this interview discussed why he thought the Icahn Agreement was the best alternative available for the union. He also discussed at length the chronology of the negotiations. In describing his thoughts before he spoke to the TWA Board when it was deciding whether to go with Icahn or Lorenzo, he said among other things:

> I had been thinking that this might be my "Swan Song." There was no question in my mind that if Lorenzo won the airline, I was probably going to get fired. There would be some reason found to get to me.... Lorenzo has developed many ways to get rid of guys, management as well as labor. I thought to myself, "If you're going to go, it might as well be in style." So, I called Icahn back and said, "I would like to read this letter to the Board, and maybe add to it." He thought it was a good idea.

Plaintiffs claim that Hoglander's dislike of Lorenzo and his desire to stay a pilot at TWA were the "personal gain" which improperly motivated him to push the Icahn Agreement.

██ Plaintiffs claim that Duffy's improper personal motivation was wanting to keep his job as union president, with its $300,000 salary and many perquisites. They say that "[a]llowing Lorenzo to take over TWA after the human and dollar cost of the battle at Continental would have been tantamount to surrender" and would have been "a real threat to his reelection as President in 1986." Plaintiffs' Further Answers to First Set of Interrogatories Propounded by Defendant Air Line Pilots Association, 24 March 1986 at 2–3. This boils down to a claim that Duffy's improper motivation was to do the will of his members so that a majority would support him for re-election. This simply fails to state a claim. Indeed a primary purpose of having elected union officials is to make sure their personal interests align with those of their members. As defendants observe, "The Labor–Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401 *et seq.*, with its elaborate provision governing union elections (29 U.S.C. § 481), reflects a clear congressional intent to encourage union democracy and to ensure union officials remain accountable through the electoral process to the membership." ALPA memo at 19.[1]

The Ninth Circuit wrote recently in *Peterson v. Kennedy*, 771 F.2d 1244, 1253–54 (9th Cir.1985):

> A union breaches its duty of fair representation only when its conduct toward a member of the collective bargaining unit is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. at [171] 190 [87 S.Ct. 903, 916, 17 L.Ed.2d 842] [1967].... The duty is designed to ensure that unions represent fairly the interests of all of their members without exercising hostility or bad faith toward any....

> The Supreme Court has long recognized that unions must retain wide discretion to act in what they perceive to be their members' best interests. [Citations omitted.] To that end, we have "stressed the importance of preserving union discretion by narrowly construing the unfair representation doctrine." *Johnson v. United States Postal Service*, 756 F.2d 1461, 1465 (9th Cir.1985, *as amended* May 3, 1985)....

> A union's representation of its members "need not be error free." *Castelli v. Douglas Aircraft Co.*, 752 F.2d 1480, 1482 (9th Cir.1985). We have concluded repeatedly that mere negligent conduct on the part of a union does not constitute a breach of the union's duty of fair representation....

> ....

---

1. Plaintiffs claim that defendants' refusal to produce more discovery about the personal finances of Hoglander and Duffy prevents them from making a better showing of Hoglander's and Duffy's improper personal motivation. The motion to compel is discussed below. [These footnotes have been renumbered.]

Sound policy reasons militate against imposing liability on unions for errors of judgment made while representing their members in the collective bargaining process.

*See also Crusos v. United Transportation Union, Local 1201,* 786 F.2d 970, 973 (9th Cir.1986) ("To show a breach of the Union's duty of fair representation, appellant must demonstrate 'substantial evidence of fraud, deceitful action, or dishonest conduct.' *Humphrey v. Moore,* 375 U.S. 335, 348 [84 S.Ct. 363, 371, 11 L.Ed.2d 370 [1964]"); *Hays v. National Electrical Contractors Association,* 781 F.2d 1321, 1324 (9th Cir. 1985) ("The Ninth Circuit has defined as 'arbitrary' conduct that is 'without a rational basis,' made with reckless disregard for the right of individual employees, or 'egregious' and 'unrelated to legitimate union interests.' *Robesky v. Qantas Empire Airways, Ltd.,* 573 F.2d 1082, 1088–90 (9th Cir.1978)."); *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 46–47, 99 S.Ct. 2121, 2124–25, 60 L.Ed.2d 698 (1979).

■ Plaintiffs cite no cases supporting the proposition that defendants' conduct was a breach of the duty of fair representation. Instead they stress that whether a union has acted in good faith is ordinarily a factual question and thus one inappropriate for summary judgment. Here, however, summary judgment for defendants is appropriate, for viewing the evidence in the light most favorable to plaintiffs, defendants are entitled to prevail as a matter of law. ALPA's leadership had ample rational reasons to fear a takeover of TWA by Lorenzo arising solely from their professional responsibility to their members. Based on Lorenzo's activities at Continental Air Lines, New York Air and Texas International, they had ample evidence that he would threaten pilots' pay and working conditions. ALPA hired Lazard Freres to find other possible buyers for TWA, an unusual move for a union, and one which demonstrates that the leadership was not blindly committed to Icahn. The union's efforts to work with existing TWA management were rebuffed and attempts to negotiate with possible intermediaries to Lorenzo went nowhere.

■ Hoglander's fear of losing his job as MEC Chairman and his dislike for Lorenzo personally may have influenced him, but there is no evidence that this fear or dislike was irrational or undue. In addition, any MEC Chairman would have had the same fear. No one can serve on the MEC who is not an active pilot, and Lorenzo's reputed hostility to unions would give union officials reasonable grounds for worrying about their future employment.

No showing of illegitimate motivation has been made for Duffy, a Delta pilot whose job Lorenzo could not threaten. As discussed above, the argument that allowing Lorenzo to prevail at TWA would have threatened his re-election as ALPA president fails to state a claim.

The August 5 Agreement was endorsed by the 21–member MEC as well as 82% of the TWA pilots. Plaintiffs claim that ALPA's membership had no choice but to accept the Agreement because the leadership improperly failed to investigate other alternatives. But plaintiffs have cited no cases indicating that ALPA had a duty to seek out other possible buyers for TWA, and it is uncontested that ALPA hired Lazard to help it do so. (Indeed in another cause of action, plaintiffs claim that reaching agreement with any prospective employer is contrary to the RLA, meaning that ALPA could only deal with existing management even when it was clear that existing management was about to be replaced.) Icahn was clearly the major possible buyer to be contended with, and it was not irrational to deal with him or to make the concessions negotiated with him during June and July 1985. Summary judgment is therefore granted for defendants on this cause of action.

2. Are the Agreement and CBA void because Icahn was not the RLA "carrier" when the Agreement was signed?

Plaintiffs seek injunctive relief and damages because the August 5 Agreement allegedly violates the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.,* which governs airline

unions (45 U.S.C. § 181). They acknowledge that "Congress in enacting the Railway Labor Act did not envision the precise circumstances which give rise to the instant litigation...." Plaintiffs' Memorandum of Points and Authorities ("Plaintiffs' Memo") at 7. Nevertheless they claim that the act implicitly imposes a rigid duty on unions to make agreements concerning labor conditions only with existing management, reciprocal to the duty explicitly imposed on management to deal only with the recognized union. No cases deal with this question in the context of a corporate takeover where existing management's days are numbered. Plaintiffs' argument is not supported by normal methods of statutory construction. Furthermore, there are sound reasons of public policy not to imply a union duty to deal only with existing management into the RLA.

The RLA establishes a comprehensive scheme governing labor relations on railroads and airlines. Among its general purposes is "to avoid any interruption to the commerce or to the operation of any carrier engaged therein" by providing for effective unions and grievance resolution procedures. 45 U.S.C. § 151a. Unions are given the right freely to organize; employers are prohibited from aiding unions (to prevent the growth of company-beholden unions); disputes on pay and conditions are to be submitted to a statutory Mediation Board, and changes in pay or working conditions may not occur while such a Mediation Board is operating; fines and imprisonment can be imposed for willful disobedience to these provisions. 45 U.S.C. § 152. Because the RLA imposes a duty on the union to deal in good faith with the carrier, plaintiffs argue that the union may not "negotiate with or enter into a legal and binding agreement concerning rates of pay, rules or working conditions with a person or entity which is neither a carrier nor an employer of the employees represented by the bargaining agent." Plaintiffs' Memo at 12–13.

 This argument of course sidesteps a central fact, which is that the agreement with Icahn would only come into effect *if Icahn did in fact become the employer.* The cases plaintiffs cite are inapposite. They establish that the RLA "imposes the affirmative duty [on the employer] to treat only with the true representative, and hence the negative duty to treat no other." *Virginian Railroad v. Federation,* 300 U.S. 515, 548, 57 S.Ct. 592, 600, 81 L.Ed. 789 (1937). They do not establish any duty by the union to deal only with the existing employer when that employer is about to be subsumed. Employers and unions do not have reciprocal roles. There has been a long history, of which the RLA's sponsors were acutely aware, of employers trying to break unions by establishing company unions or dealing with unrecognized employee representatives. Furthermore, it is within the exclusive power of employers to set wages and working conditions. While employers would have many incentives to make arrangements with unrecognized labor representatives absent a statutory ban on doing so, it would be a waste of unions' time to deal with "unauthorized" management, if such a thing existed. Because the status of unions and employers is not identical, the duties the RLA imposes on employers cannot be imposed wholesale on unions. Of course ALPA was under an obligation to negotiate in good faith with "old" TWA while it negotiated with the "new" TWA in the person of Icahn, but there is no allegation that it breached this duty.

 In addition, the RLA's scheme for resolving labor disputes is clearly aimed at "normal" disputes—an active disagreement between the existing employer and employees over particular issues covered by the CBA. ALPA had no dispute with TWA over the existing contract. There was no reason to invoke the Mediation Board or any of the other grievance-resolution mechanisms of the RLA. Thus there is no merit in plaintiffs' argument that "[t]o allow ALPA to negotiate and enter into a labor contract with non-carrier defendants Icahn and Icahn Group is to allow them to render the Mediation Board powerless over the negotiation process with the non-carrier over whom they have no jurisdiction...." Plaintiffs' Memo at 17. If ALPA and

Icahn had not been able to reach agreement, there would have been no immediate threat to TWA's operations requiring the Mediation Board's intervention. The dispute resolution apparatus created by the RLA is only appropriate to ongoing disputes between existing management and labor, to protect the flow of commerce from interruption.

■ Plaintiffs also claim that the August 5 Agreement violates § 156 of the RLA, which provides:

> Carriers and representatives of the employees shall give at least thirty days' written notice of any intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules or working conditions shall not be altered by the carrier until the controversy has been finally acted upon. . . .

Plaintiffs argue that once Icahn gained control of TWA, the August 5 Agreement (which was outside the purview of the RLA because Icahn was not a "carrier" when he signed it) was imported wholesale into the CBA, outside these detailed procedures set out in § 156.

The August 5 Agreement was not a CBA. It set detailed terms of pay and working conditions, but they were contingent upon Icahn's corporate victory. Plaintiffs have not made any showing that the required notices under this section were not given; indeed, ALPA and the "old TWA" had started their normal negotiations when the Icahn–Lorenzo takeover bids began, and one of TWA's requests was for major pay cuts. Once Icahn took over, the "new TWA" inherited the notice provided by these negotiations between ALPA and the "old TWA." In addition, pilots had ample opportunity to discuss the Agreement before approving it in August; they also had many months after the vote to express disapproval before the new CBA, which tracked the Agreement, came into effect. In any event, the purpose of the notice provisions is to protect *mutual* bargaining, to prohibit unilateral moves by either employers or labor. We have found no cases where an agreement reached by both sides in less than 30 days has been found to violate the RLA, and it would seem contrary to the RLA's purposes to impede agreements on which unions and employers can agree.

Plaintiffs are certainly correct in arguing that the August 5 Agreement was reached outside the normal framework of the RLA. But the circumstances ALPA faced were abnormal. The nature of the 1980s corporate takeovers was clearly far from Congress's mind when it passed the RLA in 1926. "The underlying philosophy of the law was, as it still is, almost total reliance on collective bargaining for the settlement of labor-management disputes." National Mediation Board, *The Railway Labor Act at Fifty* 8 (1976). It would undercut the stated purpose of the RLA—to avoid interruption to transportation service—to say that ALPA was banned from resolving potential disputes *in advance* with a likely employer. As defendants observe, "[t]he ALPA/Icahn agreement assured pilot cooperation in maintaining labor peace at TWA and uninterrupted service for the next several years. By contrast, a takeover of TWA by Texas Air substantially increased the risk that there would occur at TWA the sort of long and bitter strike that occurred at Continental." ALPA memo at 20. Defendants are granted summary judgment on this cause of action.

3. Did the August 5 Agreement violate the RLA by requiring TWA to pay ALPA's fees to Lazard Freres?

Section 152, Paragraph Fourth of the RLA provides in part:

... it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to *use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining,* or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization.... (emphasis added).

The basic idea of this paragraph is to prevent employer interference in union organizing, including employer support of company unions. Nevertheless, the language emphasized would seem to explicitly prohibit the language found in Paragraph 15(b) of the August 5 Agreement:

> [U]pon the Icahn Group obtaining control of TWA pursuant to this agreement prior to June 30, 1986, the Icahn Group shall cause to be paid to Lazard Freres & Co., the investment bankers representing ALPA, their fees and expenses in an amount equal to an aggregate of $1,500,-000 if ALPA ratifies this agreement within the time provided in Section 1 hereof, provided that if both ALPA ratifies this agreement and IAM [International Association of Machinists] ratifies the IAM Agreement within the time period provided in Section 1 hereof, such sum shall be reduced to $1,250,000....

There are no cases dealing with payment of unions' investment banker fees by successful takeover candidates who then become the employer. Insofar as the Agreement gave the union a strong financial stake in Icahn's success, and perhaps created a sense of obligation in ALPA to Icahn and TWA for paying Lazard's bill, it would seem to violate the notion of strictly independent unions inherent in the RLA.

Defendants argue that it is customary in takeovers (at least friendly ones) for the victor to pay all the investment banker fees. They say they were simply following normal investment banking practice in that Lazard would have received nothing from ALPA had the TWA deal not gone through. Affidavit of Eugene Keilin. "Normal investment banking practice" certainly makes sense when the banks' clients are two business entities, only one of which survives the merger and is thus present to pay the fee. But that analogy would appear to be inapposite here. ALPA remains intact after TWA's corporate realignment and can pay its own bills. It is supposed to be at least partially the adversary of the "new TWA." It can fairly be argued that the Agreement created an incentive in Lazard to make sure that an Icahn/ALPA deal went through, and thus may have influenced ALPA indirectly.

Defendants argue that Congress could not have foreseen the innovative arrangement ALPA reached with Icahn to protect its members' interests and [they] should not be penalized by a provision intended to guard against company-dominated unions. Reply Brief at 6 (quoting legislative history of RLA to show that this section was aimed at company unions). Drawing on analogous provisions of the Labor Management Relations Act (29 U.S.C. § 186(a)) and the National Labor Relations Act (29 U.S.C. § 158(a)(2)) prohibiting employer manipulation of unions, defendants quote the Fifth Circuit: "The legislative history of [the National Labor Relations Act] makes clear that Congress intended it, much as [the Labor Management Relations Act], to be a provision prohibiting bribery and company dominated unions, not prohibiting the kind of labor/management cooperation necessary to collective bargaining...." *NLRB v. BASF Wyandotte Corp.*, 798 F.2d 849, 856 (5th Cir.1986). In that case, however, the labor-management cooperation was much milder: giving the union representative an office with a telephone, use of the copying machine, the right to deal with employees without company permission, and four hours' wages each day for union business. *See id.* The potential for making the union beholden to the employer in that case seems much less than here.

Defendants also argue that the language of § 152, Fourth bars only "carriers" from making payments to or on behalf

of unions.[2] Plaintiffs have not made any claim against Icahn, the Icahn Group or TWA. Defendants therefore argue that plaintiffs cannot claim wrongdoing *by ALPA* because the Icahn Group paid Lazard. TWA and Icahn believe that plaintiffs are unfairly trying to bootstrap a cause of action against them by trying to hold ALPA responsible for a violation which only a carrier can commit. Letter from Howard Weber, 21 November 1986. ALPA was, however, party to the Agreement which obliged the Icahn Group to pay Lazard's fees, and benefitted from it. Section 152, Fourth prohibits the payments themselves. Money damages against ALPA, as well as an injunction against the Agreement which would affect both ALPA and TWA, remain available as remedies for violation of this section.

In the sense that Icahn and ALPA were legitimately allies in defeating Lorenzo, giving Icahn the bill for ALPA's advisors does not seem inherently unfair. It is also unlikely that Congress envisioned when it passed the RLA in 1926 that a union might become actively involved in restructuring an employer, requiring an investment banker's expensive services to procure a "white knight" or some other form of sophisticated intervention on behalf of its members. Furthermore, plaintiffs have not alleged that ALPA has become more supine towards TWA because of Icahn's agreement to pay Lazard. Nevertheless, whatever Congress's intention when the RLA was passed, and however little practical effect paragraph 15(b) may have had on softening ALPA's stance toward TWA, the RLA's explicit language would seem flatly to prohibit the assistance ALPA received from the "new TWA."

Before ruling on this cause of action, however, we seek more information about the exact nature of ALPA's relationship with Lazard. When ALPA first went to Lazard, what were its fee arrangements? (We would welcome production of all contracts between Lazard and ALPA, or in the absence of written contracts, declarations from officials on both sides about their working arrangement. We would also welcome declarations concerning fee-paying practice by other unions which have hired investment banks in related circumstances.) Was ALPA hoping to use Lazard to put together an employee leveraged buyout of TWA, in which case the new carrier was intended to pay Lazard's fees? Are there conflict of interest rules in investment banking which might call into question Lazard's giving advice to ALPA knowing that its fees would be paid only if Icahn consummated his takeover with ALPA's help? Besides *Wynadotte*, can the parties suggest any other examples [of] cases of labor-management cooperation, both lawful and unlawful, with facts more closely analogous to the instant case?

We also seek further briefing from the parties on remedies should we find in plaintiffs' favor on this cause of action. ALPA and the "new TWA" have been working together on the basis of the Agreement, ratified by 82% of ALPA's members, and then a ratified CBA which flowed out of that Agreement, for more than 18 months. Do plaintiffs contend that enjoining the CBA would be a realistic remedy? Would requiring ALPA instead of the Icahn Group to pay Lazard be adequate? Can other remedies better suited to these facts be suggested?

Defendants should submit an opening breif by April 24, 1987. Plaintiffs should file their opposition by May 8, 1987, and defendants should file their reply by May 18, 1987. We plan to consider the matter on the papers only without further oral argument, but we will schedule argument if it appears necessary.

4. Discovery motion

Plaintiffs are requesting that defendants be compelled to answer interrogatory questions already propounded. These questions deal with the personal benefit derived by union officials from their

---

**2.** "[I]t shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining."

jobs, and seek material to prove that Duffy and Hoglander were improperly motivated in reaching the August 5 Agreement. Defendants have refused to answer on the grounds that the questions are unduly burdensome and seek information unrelated to the litigation. (They also point out that the plaintiffs are trying to start a rival union and have an incentive to collect as much information about defendants as possible, whether related to the litigation or not.)

In addition to disputing the relevance of the material requested, defendants claim that the plaintiffs are trying to prolong discovery, which was cut off on August 1 except to permit TWA to take depositions of Barthelemy and Denney prior to October 15. Defendants answered the interrogatories about which plaintiffs are now complaining on July 25. The first complaint defendants heard about the adequacy of their responses was on September 15, after a telephone status conference with this court. Plaintiffs' counsel said he would be in touch about his objections, but took two weeks to do so and, according to defendants' account, was dilatory and vague in discussing his objections until this motion to compel was filed. Plaintiffs' counsel disputes defendants' account, but he does seem to have lacked diligence in pursuing his discovery complaints.

More importantly, the requests are a fishing expedition rendered moot by our disposition of the summary judgment motion in Section 1. There we found that plaintiffs had not stated a claim against Duffy, because his allegedly improper motivation was wanting to satisfy ALPA's membership to increase his chances of re-election. We also found that while Hoglander may have had personal motivations in wanting to see Icahn beat Lorenzo, including keeping his job with TWA and as Chairman of the MEC, the indisputable evidence shows that he had a rational and responsible basis for prefering that the pilots he represented not be under Lorenzo's command. Nothing plaintiffs request can alter this conclusion (unless of course some evidence of fraud by Hoglander comes out, but this has not been alleged). Accordingly we deny plaintiffs' request to compel answers to these interrogatories.

## B.

### *Judge Peckham's Order of June 20, 1988*

#### INTRODUCTION

Two TWA flight deck crewmembers challenge an August 5, 1985 agreement ("Agreement") between the Air Line Pilots Association ("ALPA") and financier Carl Icahn. Pursuant to the Agreement, ALPA agreed to certain wage and benefit concessions in the event that Icahn and his cohorts (the "Icahn Group") succeeded in their efforts to take over Trans World Airlines, Inc. ("TWA"). On March 31, 1987, we granted partial summary judgment to defendants, dismissing all claims but one: whether the Agreement violated the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.*, in that it required the Icahn Group to pay the fees of ALPA's investment banker, Lazard Freres & Co. ("Lazard"), who had been hired by ALPA to seek out potential buyers for TWA. The court requested supplemental briefing concerning this one remaining claim. Defendants now revive their motion for summary judgment. Plaintiffs respond by filing a cross-motion for summary judgment. Plaintiffs also move for reconsideration of our Order of March 31 granting defendants summary judgment on plaintiffs' claim that ALPA breached its duty of fair representation. Finally, plaintiffs move for attorneys' fees.

Icahn's bid to gain control of TWA ultimately succeeded. TWA and Icahn have been joined as indispensable parties because plaintiffs seek to void both the agreement and the subsequent collective bargaining agreement between ALPA and the new incarnation of TWA ("New TWA"). TWA and Icahn join ALPA in moving for summary judgment and opposing plaintiffs' cross-motion for summary judgment.

#### BACKGROUND

In spring 1985, Icahn purchased a large interest in TWA. Icahn announced his intention to take over the financially troubled

airline. TWA recommended that ALPA oppose the takeover attempt, largely due to its fear that Icahn would break up the airline. In early June 1985, Captain Harry Hoglander, then chairman of the Master Executive Council of ALPA's TWA chapter ("TWA-MEC"), attended congressional hearings regarding Icahn's bid. Hoglander reported to ALPA's leadership that he believed Icahn would not liquidate the airline and that TWA's fears were exaggerated.

On June 13, 1985, TWA management announced an agreement to sell the airline to Texas Air Corporation ("Texas Air"). At the time, Texas Air, which was controlled by Frank Lorenzo, owned both Continental Airlines and New York Air. TWA did not provide ALPA with advance notice of its agreement. ALPA recoiled at the prospect of a Texas Air takeover; Lorenzo was widely regarded as hostile to unions and the collective bargaining process in light of his conduct surrounding the Continental and New York Air takeovers.

TWA-MEC immediately sought an alternative buyer more receptive to labor, one willing to exchange wage and benefit concessions for guarantees regarding job security and the like. ALPA hired Lazard to facilitate its search for a willing buyer. The parties memorialized this agreement in a June 14, 1985 letter from Lazard to ALPA providing in part:

> 2. In consideration of the financial advisory and other services being rendered to you, if the Union participates in a financial transaction involving TWA during the term of this agreement or within one year thereafter, you agree to pay or use your best efforts to obtain for Lazard Freres & Co. a customary investment banking fee. In addition, and whether or not a transaction occurs, the Union will pay all of our out-of-pocket expenses, including the fees and expenses of our counsel.

Exhibit A to Supplemental Keilin Affidavit.

TWA-MEC soon reached the conclusion that Icahn represented the pilots' best hope as an alternative to Texas Air. They based this conclusion on the fact that Icahn had already accumulated a good many TWA shares. Thus, any third party "white knight" would have had to buy out Icahn at a price equal to or greater than the one Texas Air could offer, necessitating even greater concessions by the pilots. TWA-MEC also recognized the need to act quickly if they were to succeed in thwarting Lorenzo's takeover attempt.

On July 1, 1985, Icahn and ALPA entered into an agreement whereby Icahn committed to seeking control of TWA in exchange for a variety of wage and benefit concessions by ALPA. Paragraph 15(b) of that agreement provides:

> [U]pon any Merger pursuant to this Agreement occurring prior to June 30, 1986, New TWA shall pay to the investment bankers representing the Unions [ALPA, the International Association of Machinists ("IAM") and the Independent Federation of Flight Attendants] their fees and expenses not exceeding an aggregate of $2.5 million, provided that such sum shall be reduced to $1.5 million unless IAM executes and ratifies a Comparable Agreement within the time periods set forth in Section 1 hereof

Icahn's bid to take over TWA succeeded. Icahn and ALPA thereafter executed the August 5, 1985 Agreement, which supersedes the July 1 agreement and is the subject of this motion. Paragraph 15(b) of that agreement provides:

> [U]pon the Icahn Group obtaining control of TWA pursuant to this agreement ..., the Icahn Group shall cause to be paid to [Lazard], the investment bankers representing ALPA, their fees and expenses in an amount equal to an aggregate of $1,500,000 if ALPA ratifies this Agreement ..., provided that if both ALPA ratifies this Agreement and IAM ratifies the IAM Agreement ..., such sum shall be reduced to $1,250,000....

In August 1985, TWA pilots ratified the Agreement by a vote of 1,277 to 293. On January 3, 1986, the Agreement was subsumed into a collective bargaining agreement between ALPA and New TWA. At the same time, New TWA assumed respon-

sibility for paying Lazard's fees, which it ultimately did.[3]

## DISCUSSION

Summary judgment serves as a means of avoiding trial where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Bloom v. General Truck Drivers, Office, Food & Warehouse Union, Local 952*, 783 F.2d 1356, 1358 (9th Cir.1986). To defeat such a motion, the non-movant must show that there exist "genuine factual issues that properly can be resolved only by a finder of fact *because they may reasonably be resolved in favor of either party.*" *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). "[T]he non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial*'" with respect to a material fact. *Matsushita Elec. Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56). The non-movant cannot merely rest on allegations in its pleadings. Rather, it must set forth specific material facts via affidavit or otherwise to defeat the motion. *See Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983).

Here, plaintiffs' claim arises under section 152, paragraph Fourth of the RLA, which provides in relevant part:

[I]t shall be unlawful for any carrier ... to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization....

45 U.S.C. § 152, Fourth. There is no question that this provision applies to air carriers such as TWA. 45 U.S.C. § 181.

In our prior order, we suggested that TWA's payment of ALPA's investment banking fees constituted a *per se* violation of section 152, Fourth. We declined to rule on this issue, however, instead requesting further briefing in order to understand more fully the relationship between ALPA, Lazard and TWA.

Defendants now challenge our previous order's tentative conclusion that, literally construed, section 152, Fourth proscribes their conduct. The August 5 Agreement obliged the Icahn Group to pay Lazard's fees. The Icahn Group was not then, nor is it now, a carrier. Accordingly, ALPA argues that section 152, Fourth does not apply to the instant transaction. Concededly, New TWA ultimately paid Lazard's fee, and New TWA *is* a carrier. ALPA argues, however, that New TWA's decision to assume responsibility for the Icahn Group's debt is something over which it had no control. If this payment violated the statute, so the argument goes, that violation cannot be attributed to ALPA.

---

**3.** The Agreement also provides for an increase in the pilots' "Flight Loss Bank" from 500 hours to 3,000 hours. The Flight Loss Bank is an account that pilots can drawn on whenever they miss scheduled flights in order to conduct union business. So long as there are hours in the Flight Loss Bank upon which the pilot can draw, the airline pays the pilot as if he or she had flown the scheduled flight. To the extent that the missed flight is not covered by the Flight Loss Bank, TWA bills ALPA for the pilot's pay.

Plaintiffs argue that TWA increased the Flight Loss Bank in order to "buy off" ALPA, much like the payment of ALPA's investment banking fees, and in further violation of RLA § 152,

Fourth. The plaintiffs first raised the Flight Loss Bank issue in their supplemental brief in support of their cross motion for summary judgment. In requesting further briefing, however, we made it clear that the sole issue remaining was whether the Agreement violated the RLA by requiring TWA to pay ALPA's investment banking fees. The increase in the Flight Loss Bank is entirely unrelated to this issue, and we need not consider it. Moreover, plaintiffs themselves acknowledge that ALPA made substantial concessions in order to obtain this increase. Plaintiffs' Supplemental Memorandum at 17. There is thus no evidence that this constituted part of a general effort to undermine ALPA's autonomy, or that it had that effect.

We reject this argument. First, defendants elsewhere state that, under standard business practice, the acquiring corporation in a merger ordinarily pays the target's investment banking fees. Keilin Affidavit at 2. Throughout the negotiations between ALPA, Lazard and Icahn, the parties accepted "as a matter of course" that standard practice would be followed here, Supplemental Keilin Affidavit at ¶ 10, for paragraph 15(b) of the Agreement was never the subject of serious discussion. *Id.* Accordingly, ALPA undoubtedly assumed, along with everyone else, that New TWA would pick up the Lazard tab. Second, the July 1 agreement, later superseded by the August 5 Agreement, specifically provided that New TWA would pay Lazard's fee. Given that this is ultimately what happened, the substitution of the Icahn Group for New TWA in the August 5 Agreement appears to be nothing more than a smoke screen to avoid violating the RLA.

Defendants also revive their argument that it is incongruous to apply the RLA, which by its terms regulates the conduct of carriers, to a labor union. TWA and Icahn also question the court's subject matter jurisdiction over an RLA suit by union members against their union. Our previous order rejected these arguments. Defendants advance no new rationale for abandoning our prior position, and so we decline to reconsider our order.

Finally, defendants' argue that ALPA never received any money from New TWA, and that the payment merely served to fulfill a contractual obligation of the Icahn Group. The assumption of a labor union's obligations violates section 152, Fourth just as much as a direct financial contribution. The question remains, however, whether the obligation really was ALPA's. According to the terms of the June 14 letter, ALPA agreed "to pay or use [its] best efforts to obtain" for Lazard a "customary investment banking fee" in the event that ALPA's effort to find an alternate buyer succeeded. Had the deal with Icahn fallen through, ALPA would not have been obliged to pay Lazard's fee. The success of the transaction was a neces-

sary condition to ALPA's duty to pay. With the signing of the Agreement, the deal was consummated and ALPA's obligation to pay Lazard's $1.25 million fee became unconditional. Under this very same Agreement, the Icahn Group agreed to pick up Lazard's tab, in accordance with standard banking practice. Thus, at the same moment that ALPA's duty to pay Lazard ripened, the Icahn Group assumed that liability. Strictly speaking, ALPA never owed Lazard anything. When New TWA eventually paid Lazard's fees, it was assuming the debt of the Icahn Group—a nonunion. It is true that Lazard was hired by ALPA, represented ALPA and served ALPA's interest, but ALPA never incurred any debt to Lazard. As noted in our previous order, ALPA survived the transaction and could have paid its own bills. Never for a moment was it obliged to do so, however. At most, ALPA's liability was a potentiality, and section 152, Fourth does not proscribe mere potentialities.

In our prior order, we expressed concern regarding the incentives created in Lazard by this fee arrangement. Investment banking fees ordinarily hinge on the consummation of the underlying transaction, Supplemental Keilin Affidavit at ¶ 18, so such incentives invariably lurk beneath the surface of contingent fee arrangements like this one. Although there are no conflict of interest rules in investment banking calling into question these sorts of arrangements, *id.*, the Lazard/ALPA agreement did create an incentive in Lazard to see that a deal went through. This concern misses the mark, however. Lazard would have been just as satisfied had it received its fee from ALPA. The real issue here is not Lazard's motives, but the identity of the payor—that is the risk the RLA is intended to address. We therefore conclude that section 152, Fourth does not reach the instant arrangement.

Even if we view the transaction as the assumption of an unconditional obligation of ALPA by TWA, we find that no RLA violation occurred under the circumstances of this case. There is no case law specifically dealing with whether a new

employer's payment of a union's investment banking fees arising out of a successful takeover initiated by the union constitutes an impermissible financial contribution. One recent case suggests that a payment resembling the instant one would not run afoul of section 152, Fourth. In *IAM Stock Ownership Inv. Trust Fund v. Eastern Air Lines, Inc.*, 639 F.Supp. 1027 (D.Del.1986), the trustee of a union-sponsored trust fund benefitting airline employees moved for a preliminary injunction directing Eastern Air Lines to pay the fund's legal and investment banking fees. These fees were needed to obtain an independent analysis of whether the trustee ought to accept consideration offered for the fund's common and preferred stock by Texas Air's Frank Lorenzo in connection with a takeover attempt, or to exercise the fund's state-law appraisal rights. The trust fund documents authorized the trustee to incur such legal and financial expenses at Eastern's expense. The trustee brought a preliminary injunction to force Eastern to uphold its obligation. Eastern's obligation was conditioned, however, on receipt of certification that such funds would benefit the fund, not the union, partly to avoid violating RLA section 152, Fourth. The court found that the certification offered was inadequate, particularly in light of the close connections between the trustee and the union and the broad discretion afforded the trustee in using these funds. *Id.* at 1036–37. There was thus considerable risk that the funds would "enable the Trustee to use Eastern as a source of funds, even if in an indirect fashion, for the [union's] publicly announced goal of blocking the proposed merger between Texas Air and Eastern," *id.* at 1037, in violation of trust fund provisions and ERISA, 29 U.S.C. § 1104(a)(1)(A), (B). The court then turned to Eastern's claim that paying these fees would violate RLA section 152, Fourth, stating:

> It is more open to question … whether the funds provided to the Trust "could reasonably be construed to be" in violation of the Railway Labor Act's prohibition against "assisting or contributing" to the [union]. 45 U.S.C. § 152, Fourth. That provision is aimed at efforts by the employer "to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization…." *See International Association of Machinists v. Street*, 367 U.S. 740, 759 [81 S.Ct. 1784, 1795, 6 L.Ed.2d 1141] (1961); *American Airlines, Inc. v. National Mediation Board*, 588 F.2d 863, 865 (2d Cir.1978). Although the requested financing would undoubtedly affect the [union] and "influence" the union in some fashion, the monies would not be aimed at undermining the employees' right to organize and to elect labor representatives and ultimately aimed at formation of company-dominated unions, the illegal purpose which Congress sought to prevent in enacting the statute.

*Id.* at 1038.

Cases under the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 *et seq.*, and the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 141 *et seq.*, provide further support for granting defendants' motion for summary judgment. Courts have frequently looked to other labor law in construing analogous provisions of the RLA. *See, e.g., Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir.1987) (courts "often refer [to the NLRA] in construing the RLA"); *Pan American World Airways, Inc. v. International Bhd. of Teamsters*, 275 F.Supp. 986, 997–98 (S.D.N.Y.1967), *aff'd*, 404 F.2d 938 (2d Cir.1969) (NLRA provides "cogent analogy in the solution of similar problems arising under the [RLA]"). The Supreme Court has endorsed drawing parallels between the RLA and other labor law, provided such parallels are drawn with the "utmost care." *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 579 n. 11, 91 S.Ct. 1731, 1736 n. 11, 29 L.Ed.2d 187 (1971); *see also Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383, 89 S.Ct. 1109, 1117–18, 22 L.Ed.2d 344 (1969) (courts should only import NLRA into RLA "circumspectly").

NLRA § 8(a)(2), 29 U.S.C. § 158(a)(2), and LMRA § 302(a), 29 U.S.C. § 186(a), provide apt analogies to RLA § 152,

Fourth. These sections make it unlawful for employers to provide financial or other support to labor organizations. " 'Support' is proscribed because, as a practical matter, it cannot be separated from influence." *Chicago Rawhide Mfg. Co. v. NLRB*, 221 F.2d 165, 167 (7th Cir.1955). Courts distinguish, however, between support, which is prohibited, and cooperation, which is not. As the Fifth Circuit has stated, "[t]he legislative history of [NLRA] § 8(a)(2) makes clear that Congress intended it, much as [LMRA] § 302, to be a provision prohibiting bribery and company dominated unions, not prohibiting the kind of labor/management cooperation necessary to collective bargaining." *NLRB v. BASF Wyandotte Corp.*, 798 F.2d 849, 856 (5th Cir.1986); *see also NLRB v. Homemaker Shops, Inc.*, 724 F.2d 535, 545 (6th Cir.1984); *Hertzka & Knowles v. NLRB*, 503 F.2d 625, 630 (9th Cir.1974), *cert. denied*, 423 U.S. 875, 96 S.Ct. 144, 46 L.Ed.2d 106 (1975); *Lake City Foundry Co., Inc. v. NLRB*, 432 F.2d 1162, 1174 (7th Cir.1970). As the Ninth Circuit said in *Hertzka & Knowles* in the context of an action under NLRA § 8(a)(2):

> Literally, ... almost any form of employer cooperation, however innocuous, could be deemed "support" or "interference." Yet such a myopic view of § 8(a)(2) would undermine its very purpose and the purpose of the [NLRA] as a whole—fostering free choice—because it might prevent the establishment of a system the employees desired. Thus, the literal prohibition of § 8(a)(2) must be tempered by recognition of the objectives of the NLRA.

*Id.* at 630; *accord Chicago Rawhide*, 221 F.2d at 167.

Obviously, the line between cooperation and support is not an obvious one. Permissible cooperation becomes prohibited support once the union's independence is compromised. This is a subjective inquiry: the question is whether the assistance provided the union is *in fact* depriving employees their freedom of choice. It is not the potential for but the reality of domination that these statutes are intended to prevent. *See Homemaker Shops*, 724 F.2d at 545; *NLRB v. Northeastern Univ.*, 601 F.2d 1208, 1213–14 (1st Cir.1979); *Hertzka & Knowles*, 503 F.2d at 630 (inquiry is "subjective," based upon the standpoint of the employees); *Modern Plastics Corp. v. NLRB*, 379 F.2d 201, 204 (6th Cir.1967) ("active domination must be shown before a violation is established"); *Chicago Rawhide*, 221 F.2d at 167; *NLRB v. Wemyss*, 212 F.2d 465, 471 (9th Cir.1954); *see also NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 459–60, 11 L.Ed.2d 435 (1964) (employer's motive in providing benefits relevant to finding domination); *Lawson Co. v. NLRB*, 753 F.2d 471, 476 (6th Cir.1985) (same). These principles apply equally to the RLA, for it, too, is intended to secure for employees the right of free choice. *See International Ass'n of Machinists v. Street*, 367 U.S. 740, 759, 81 S.Ct. 1784, 1795, 6 L.Ed.2d 1141 (1961); *American Airlines, Inc. v. National Mediation Bd.*, 588 F.2d 863, 865 (2d Cir.1978).

Courts have frequently permitted minor assistance even though employer conduct constituted a literal violation of NLRA § 8(a)(2). *See, e.g., BASF Wyandotte*, 798 F.2d at 851–52 (employer provided union with air conditioned office, telephone, use of copier); *Homemaker Shops*, 724 F.2d at 545–47 (scheduling of union meetings, assistance with union elections, reimbursement for work time lost and travel expenses incurred due to union activities and provision of coffee and company space for meetings not violative of NLRA); *Lake City Foundry Co.*, 432 F.2d at 1178 (use of company property for meetings); *NLRB v. Post Publishing Co.*, 311 F.2d 565, 569–70 (7th Cir.1962) (permitting union to hold meetings in company cafeteria, use copier and retain profits from cafeteria operations "a permissible form of friendly cooperation designed to foster and resulting in uninterrupted harmonious labor-management relations" not intended to coerce employees).

To be sure, payment of a $1.25 million obligation hardly seems like minor assistance. Nevertheless, whether the Agreement violates the RLA turns on a finding that it actually deprived ALPA's members of a meaningful choice of bargaining representatives. Plaintiffs argue that the

Agreement had precisely this effect. Indeed, plaintiffs helped form a rival union, the Airline Pilots' Union ("APU"), to challenge ALPA's representation of TWA pilots. This organizational effort eventually succumbed, allegedly due to ALPA's superior funding. Herbert Affidavit at ¶ 4. By assuming ALPA's obligation to Lazard, TWA enlarged ALPA's funding advantage over the APU, thus depriving TWA pilots of an unimpeded choice of bargaining representative. *Id.*

We are unpersuaded by plaintiffs' argument. Facts showing that the dominated union was organized in direct response to an outside organizational effort are powerful evidence of unlawful assistance. *See, e.g., Lawson Co.,* 753 F.2d at 477. Here, however, the APU was not even formed until December 1985, well after the Icahn Group agreed to pay Lazard's fee. The parties to the Agreement could not have intended to restrict pilots' free choice of bargaining representative, for no choice existed at the time the Agreement was formed. There is no evidence that TWA or ALPA gave the slightest thought to the effect paragraph 15(b) of the Agreement might have on a hypothetical rival to ALPA; as previously noted, this provision was adopted without serious negotiation or comment. Supplemental Keilin Affidavit at ¶ 10.

We instead conclude that, even if TWA assumed an unconditional obligation of ALPA to pay Lazard (and we have already concluded that it did not), the Agreement did not violate RLA section 152, Fourth under the circumstances of this case. There is no evidence that ALPA became somehow beholden to TWA by virtue of the Agreement. Indeed it is significant that ALPA itself initiated the transaction. *See Hertzka & Knowles,* 503 F.2d at 631 (fact that employee initiated idea that management serve on employee committees evidence of no domination); *cf. Lawson Co.,* 753 F.2d at 477 (fact that employer initiated offer of assistance to union supported finding of unlawful domination). Moreover, the members of ALPA approved the Agreement by a wide margin. *See Lawson Co.,* 753 F.2d at 478 (employee satisfaction

with existing representation is one factor to consider in determining whether NLRA has been violated); *Homemaker Shops,* 724 F.2d at 547 (same). Finally, even though the magnitude of the payment dwarfs that found in typical employer-employee cooperation cases, this transaction actually posed less of a threat to union independence than most; the assumption of Lazard's fee represented a one-time payment, whereas in most cases the assistance consists of ongoing support which the employer can withdraw if the union displeases it. *Cf. Exchange Parts Co.,* 375 U.S. at 409–10, 84 S.Ct. at 459–60 (danger of domination diminished where benefits conferred are permanent and unconditional).

In sum, we conclude that RLA section 152, Fourth does not apply to the instant case. First, ALPA's duty to pay Lazard's fee never became unconditional; thus, there was no ripened obligation for TWA to assume. Second, even if TWA did assume an unconditional obligation of ALPA, this amounted to permissible employer-employee cooperation. It would be anomalous indeed to hold that section 152, Fourth—a provision intended to guarantee employees' freedom of choice—prohibits a transaction representing a novel exertion of the employees' collective will to determine their own fate. This transaction amply demonstrates that "changing conditions in the labor-management field seem to have strengthened the case for providing room for cooperative employer-employee arrangements as alternatives to the traditional adversary model." *Northeastern Univ.,* 601 F.2d at 1214; *see also Hertzka & Knowles,* 503 F.2d at 631 (rejecting "purely adversarial model of labor relations"). Accordingly, the defendants' motion for summary judgment is granted, and the plaintiffs' cross-motion for summary judgment is denied.

Plaintiffs also ask that we reconsider our prior grant of defendants' summary judgment motion on the plaintiffs' breach of the duty of fair representation claim. Plaintiffs do not set forth any additional facts, argument or legal authority in support of

their motion. We therefore decline to reconsider our prior order.

Finally, plaintiffs invoke the common fund doctrine in moving for an award of attorneys' fees. Because no fund has been created from which an award of attorneys' fees may be made, this motion is denied.

## II.

Plaintiffs advance one argument not expressly covered by Judge Peckham's orders.

Plaintiffs claim the district court erred in relying on the affidavits of Hoglander and Keilin because they did not meet the requirements of personal knowledge and testimonial competence.[4] *See* Fed.R.Civ.P. 56(e). We review evidentiary decisions for abuse of discretion. *Kisor v. Johns-Manville Corp.*, 783 F.2d 1337, 1340 (9th Cir. 1986).

 That Rule 56(e)'s requirements of personal knowledge and competence to testify have been met may be inferred from the affidavits themselves. *See Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th Cir. 1980). Hoglander was chairman of the TWA–MEC, and the district court relied on his affidavit as evidence of TWA–MEC's fears of Frank Lorenzo and TWA–MEC's search for potential buyers of TWA. Keilin, an investment banker with Lazard Freres, represented ALPA in its negotiations with Icahn, and the district court relied on his affidavits as evidence of the circumstances of the negotiation and the intent of the parties with respect to the ALPA–Lazard Freres agreement and the ALPA–Icahn agreement. Hoglander's and Keilin's personal knowledge and competence to testify are reasonably inferred from their positions and the nature of their participation in the matters to which they swore no abuse of discretion appears.

AFFIRMED.

---

**4.** Although plaintiffs challenge the personal knowledge and competence to testify of seven affiants, the district court relied on only the affidavits of Hoglander and Keilin in the orders from which plaintiffs appeal.